IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PAUL C. MILLER,<br><br>           Plaintiff,<br><br>    v.<br><br>RXMAPPER, LLC, a Delaware Limited Liability Company; JAMES MILLER, individually; CHRIS GRILLI, individually; and DAVID UPJOHN individually,<br><br>           Defendants. | Civil Action No. 24-1273-CFC |

---

Samuel T. Hirzel, II and Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Steven M. Hecht, ROLNICK KRAMER SADIGHI LLP, New York, New York

    *Counsel for Plaintiff*

Alan D. Albert, O'HAGAN MEYER PLLC, Wilmington, Delaware

    *Counsel for Defendants*

**MEMORANDUM OPINION**

March 3, 2026
Wilmington, Delaware

                                                                    _____
                                                                    COLM F. CONNOLLY
                                                                    CHIEF JUDGE

Plaintiff Paul C. Miller has sued RxMapper, LLC (RxMapper), James Miller, Chris Grilli, and David Upjohn for violations of the federal securities laws and common law. D.I. 2. Plaintiff alleges that Defendants engaged in a scheme to defraud Plaintiff by fabricating pretextual grounds to trigger the company's call right, manufacturing a forced sale of Plaintiff's equity units, and undervaluing those units based on a fraudulent valuation. D.I. 2 ¶ 17. The Complaint has seven causes of action: (I) violation of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5(a) and (c), (II) violation of § 20(a) of the Exchange Act, (III) Common Law Fraud, (IV) Common Law Negligent Misrepresentation, (V) Tortious Interference with Contractual Relations, (VI) Conversion, and (VII) Breach of Contract.

Pending before me is Defendants' motion to dismiss Counts I through VI of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). D.I. 17.

I.      BACKGROUND

The following background is based on the factual allegations in the Complaint and in documents explicitly relied upon in the Complaint. I must accept these allegations as true and read them in the light most favorable to Plaintiff for the purposes of deciding this Rule 12(b)(6) motion. *See Umland v. PLANCO Fin.*

*Servs.*, 542 F.3d 59, 64 (3d Cir. 2008); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

RxMapper is a "personalized medication platform and telehealth consult practice that analy[zes] the DNA sequencing results of patients and identifies which drugs patients should and should not take based on their DNA, resulting in lower costs and better healthcare outcomes." D.I. 2 ¶ 20. Plaintiff co-founded RxMapper with the Defendants Chris Grilli, Jim Miller, and David Upjohn (collectively, the Individual Defendants), who are the three managers of RxMapper, a limited liability company. D.I. 2 ¶¶ 29, 34. The parties executed an Operating Agreement on or about June 25, 2018, and each received Founding Member common units, giving them an equity stake in the company: 34,500 units each (34.85% equity) for Grilli and Upjohn, and 15,000 units each (15.15% equity) for Paul and Jim Miller. D.I. 2 ¶ 29.

Plaintiff alleges that Defendants "engineered and executed a scheme to bring about an illegitimate and illegal forced sale of [Plaintiff's] Founding Member equity securities back to RxMapper at a valuation that was wrongfully manipulated to be so low as to constitute outright fraud." D.I. 2 ¶ 1. The scheme began in 2022 when the Individual Defendants gifted 16,000 incentive units to Jim Miller to expand his ownership in the company to 27%, while decreasing Plaintiff's ownership to 13%, excluding Plaintiff from the meeting approving the issuance of

2

the units despite his objection to the new shares. D.I. 2 ¶¶ 32, 34, 37, 38. Plaintiff also alleges that the Individual Defendants amended the Operating Agreement in June 2022 to remove his access to the Company's data room and keep him out of the signature block on the agreement, in effect exiting him from the inner circle of Initial Members and centralizing control of the Company into Defendants' hands. D.I. 2 ¶¶ 31, 33, 39.

Plaintiff describes Defendants' scheme, excluding the initial amendment to the Operating Agreement and dilution of Plaintiff's shares, as having five steps, each with a name of its own. D.I. 2 ¶¶ 2–3. First was the Blessing Lie: Defendants lied to Plaintiff in August and September 2022 about whether he could effectuate Simple Agreements for Future Equity (SAFE)—a financial instrument that defers equity issuance—involving his Founding Member units with members of his college fraternity Phi Psi. D.I. 2 ¶¶ 2, 40. Plaintiff alleges that Defendants expressly permitted him to execute SAFE transactions with Phi Psi investors and ensured that doing so would not violate the Company's Operating Agreement or trigger Defendants' right of first refusal. D.I. 2 ¶¶ 40–46.

Second was the About-Face Lie: Defendants lied by "claiming the transactions that they themselves previously blessed were now being disallowed and asserting that such transactions triggered a call right under the Company's operating agreement." D.I. 2 ¶¶ 3, 47. Specifically, Plaintiff alleged that Chris

Grilli sent him emails in December 2022 and January 2023 stating that Plaintiff "was not to sell interests" in RxMapper Founding Member Units and that doing so would meet the definition of "Transfer" under the Operating Agreement and allow RxMapper to assert a right of first refusal. D.I. 2 ¶¶ 47–48.

Third was the Call Right Artifice: Defendants, realizing they missed their window to exercise their call right, hatched a plan to "fix" the error by using "a secret second amendment of the Company's operating agreement that precisely expanded Defendants' purported ability to declare the triggering of the purported call right." D.I. 2 ¶¶ 3, 51. The first amended Operating Agreement only permitted a call right within ninety days of the date of the event giving rise to the call right—a day "in September 2022" (but not identified specifically in the Complaint), when Plaintiff attempted to transfer his units. D.I. 2 ¶¶ 51, 54. Accordingly, Defendants amended the Operating Agreement again in secret in January 2023 to permit exercising the call right within 90 days of "becoming aware" of the triggering Transfer. D.I. 2 ¶¶ 51–56. The Company's law firm sent an email in March 2023 that revealed this amendment, advised Plaintiff that he breached the Operating Agreement by transferring his units in RxMapper and that RxMapper could invoke its call right, and refused Plaintiff's requests for a books-and-records inspection. D.I. 2 ¶¶ 47–50, 58–59.

Fourth was the Forced Sale Artifice: on April 5, 2023, Defendants sent a letter to Plaintiff stating that Plaintiff breached the Operating Agreement and that Defendants were exercising the Company's call right to acquire all 15,000 of Plaintiff's Founding Member Units at a fair market value of $1.30 per unit. D.I. 2 ¶¶ 50, 60. The buyout letter also stated that Defendants had elected to reduce the purchase price of the units by 25% because of material breach of the Operating Agreement. D.I. 2 ¶ 61.

Fifth and last was the Valuation Lie: Defendants told Plaintiff that RxMapper's value was only $150,000 while telling investors that RxMapper's value was at least $150 million, thus "forc[ing] the sale of Plaintiff's equity securities back to the Company at this fraudulently depressed valuation." D.I. 2 ¶¶ 3, 60–63. Plaintiff also alleges that Defendants estimated the value of RxMapper as at least $150 million many times, citing to investor decks, ongoing litigation, a grant from the University of Wisconsin-Madison, a contract with Mayo Clinic, and an agreement with Scripta Insights. D.I. 2 ¶¶ 62–76.

## II.  LEGAL STANDARDS

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiffs. *Umland*, 542 F.3d at 64. The court may consider only the allegations in the complaint and the documents incorporated into the complaint

by reference and matters of which the court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). It must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

## III. DISCUSSION

### A. Counts I and II

I will deny the motion insofar as it seeks dismissal of Counts I and II. Defendants argue that these counts fail as a matter of law for two reasons: First, because Plaintiff's membership interests in RxMapper are not securities, D.I. 18 at 9; and second, because "[a]n obligatory sale means no investment decision was made," D.I. 18 at 14 (some capitalization removed).

I reject the first argument because the Complaint and Operating Agreement plausibly imply that Plaintiff did not "meaningfully participate[] in the management" of RxMapper or have more than "minimal control" over its performance. *Steinhardt Grp. Inc. v. Citicorp*, 126 F.3d 144, 152 (3d Cir. 1997). While the Operating Agreement gives him some rights and he played a role in the formation of RxMapper, his role as a member in a manager-managed LLC and the absence of any facts showing involvement in the company's direction suggest that he did not exercise such direction. Plaintiff Miller had only a 15% share in RxMapper, and his powers generally required the agreement of other members and managers, with little effect on management of the company. For instance, his right to amend the Operating Agreement required "the vote of the Members holding at least 80% of the Units," D.I. 18-2 ¶ 16.9, and his right to replace a manager required "the vote of Members holding a majority of the Units," D.I. 18-2 ¶ 8.4.

7

Plaintiff's powers under the Operating Agreement can also be distinguished from those of the plaintiffs in *Keith v. Black Diamond Advisors* 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999), and *Rossi v. Quarmley*, 604 F. App'x 171 (3d Cir. 2015). In *Keith*, the district court observed that Keith intended to maintain some degree of control over the LLC, acquiring an interest pursuant to representations that he would "oversee the marketing operations," and gained many rights under the operating agreement in question, including the "right to manage" the LLC along with other members and protection from other members acting individually—a "level of control [] antithetical to the notion of member passivity required under the fourth prong of *Howey*." 48 F. Supp. 2d at 333. While some of Plaintiff's powers resemble Keith's, Keith was involved in a member-managed LLC, while Plaintiff was part of a manager-managed LLC, so his interests are more likely to qualify as a security because "members' ability to exercise management control is effectively non-existent." *Shirley v. Jed Capital, LLC*, 724 F. Supp. 2d 904, 911 (N.D. Ill. 2010). Here, the Managers of RxMapper—the three Individual Defendants—managed the business and affairs of the Company, while Miller, as a member with only 15% equity, had limited powers that require the agreement of others to exercise.

Defendants also try to cast the facts here as similar to *Rossi*, where the Third Circuit found a "commercial venture" as opposed to an "investment contract,"

8

because both plaintiffs had similar equity shares to other members and some rights affecting management like calling special meetings with the agreement of one other member and examining financial documents. D.I. 29 at 3; 604 Fed. App'x 171, 175 ("Rossi's dissatisfaction with the majority's decisions does not convert his participation as a partner to an investment contract."). But "Rossi's ownership share and rights to profits were equal to his partners'," and Rossi had equal rights to the other members. *Id.* at 172–75. By contrast, here, Plaintiff as a member had significantly less power than the Managers of the Board, the three Individual Defendants.

Of course, if discovery reveals that Plaintiff did intend to be more than a passive investor, Defendants can file a motion for summary judgment on the same issue. *See Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss based on the third prong of the *Howey* test because "Defendants' arguments to the contrary are better suited to support a motion for summary judgment").

I reject the second argument because Defendants did not even attempt to address in their reply brief the case law Plaintiff cited in support of his argument that he has stated claims of securities fraud under the "forced seller" doctrine.

9

### B. Counts III and IV

Defendants argue that I must dismiss Plaintiff's claims under Delaware law for fraud (Count III) and negligent misrepresentation (Count IV) for "bootstrapping" because they are "derived from rights and obligations that are in the language of the 'very contract' upon which Plaintiff simultaneously sues," and Plaintiff does not seek additional damages beyond those he would be entitled to under his breach of contract claim. D.I. 18 at 15–17 (citation omitted). I agree.

Delaware law prohibits the bootstrapping of a breach of contract claim into a tort claim "merely by alleging that a contracting party never intended to perform its obligations," *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020), or "merely by intoning the prima *facie elements* of the tort while telling the story of the defendant's failure to perform under the contract," *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012); *see* D.I. 18 at 15–16; D.I. 23 at 18. For a fraud claim to survive along with a breach of contract claim, the plaintiff must allege "conduct that is separate and distinct from the conduct constituting breach." *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2018 WL 3084975, at *14 (Del. Super. Ct. June 21, 2018); *see also Anschutz*, 2020 WL 3096744, at *15 ("[F]or both a breach-of-contract and a tort claim to coexist, in a single action, the plaintiff must allege that the defendant breached a duty that

is independent of the duties imposed by the contract."). For example, if the plaintiff "seeks a remedy for fraud based in . . . rescissory damages, not compensatory damages, the plaintiff/buyer may plead a fraud claim next to a breach of contract claim." *Anschutz*, 2020 WL 3096744, at *15.

Here, Plaintiff's fraud and misrepresentation allegations are not "separate and distinct" but rather are based on Defendants' failure to abide by the Operating Agreement. In Plaintiff's own words, the "gravamen of [his] misrepresentation claims is that Defendants falsely assured Plaintiff that execution of SAFE agreements would not breach the Operating Agreement and trigger the call right, and that they would not take action contrary to those assurances, as part of a scheme to induce him to do so and to use the SAFE agreement as a pretext to confiscate his Units, all while secretly amending the Operating Agreement to expand the notice period." D.I. 23 at 18 (citing D.I. 2 ¶¶ 114–22). But alleging that Defendants stated that SAFE agreements would breach the Operating Agreement and amended the Operating Agreement in secret does not implicate any duties *independent* of duties under the Operating Agreement: The Operating Agreement governs whether the SAFE agreements would breach it, D.I. 18-2 ¶ 10.1, amending the Operating Agreement, ¶ 16.9, and valuation of Units, ¶ 11.2. In Plaintiff's own words, the "gravamen of Plaintiff's contract claim is that Defendants breached the Operating Agreement by, among other things,

11

(1) improperly exercising the Call Right (Compl. ¶ 153), (2) exercising the Call Right outside the period allowed by the Operating Agreement (*id.* ¶154), and (3) repurchasing Plaintiffs' Units at less than fair market value. (*Id.* ¶155.)." D.I. 23 at 18. Accordingly, Defendants' allegations of fraud and misrepresentation "were not collateral to the [contract], but rather memorialized . . . some of [Defendants'] principal obligations under their agreement with [Plaintiff]." *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D. Del. May 24, 2001).

Plaintiff's fraud claims also fail for another reason: he has "failed to plead damages caused by the fraud separate and apart from the alleged breach damages." *Cornell Glasgow*, 2012 WL 2106945, at *8–9. Plaintiff's damages allegations in Counts III and IV state that as a result of Defendants' "fraudulent misconduct" and "misrepresentations," "Plaintiff has suffered damages," with punitive damages as well for the fraud claim. D.I. 2 ¶¶ 121, 122, 130, 131. His breach of contract count also alleges damages, "including but not limited to not receiving fair value for his Founding Member Units." D.I. 2 ¶ 160. Adding punitive damages in the fraud counts is "not enough to distinguish it from the contract damages," as the counts neither plead "rescission nor rescissory damages"—Plaintiff does not want to unwind the transaction—so Plaintiff has failed to separate the damages to its fraud claims from its contract damages. *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6–7 (Del. Super. Ct. Mar. 13, 2017).

12

Plaintiff also argues that I "could determine that Defendants defrauded Plaintiff, but did not breach the Operating Agreement, or that Defendants did both, but the remedies for each are distinct." D.I. 23 at 17–18. He says, for example, that I could "find that Defendants fraudulently induced Plaintiff's actions by assuring Plaintiff he could enter into the SAFE agreements, and award damages based on the value of Plaintiffs' Units as of the date of judgment." D.I. 23 at 19. But Plaintiff mischaracterizes the test for bootstrapping: Plaintiff's sale of his units is controlled by Section 10.1 of the Operating Agreement, not by any representations independent of contract; so any damages would be recovered via breach of contract, and the two counts do not rely on separate and distinct conduct as required. *See Ashland*, 2018 WL 3084975, at *14.

### C. Count V

I will deny Defendant's motion insofar as it seeks the dismissal of Count V. Plaintiff alleges in Count V that under Delaware law the Individual Defendants interfered with the contractual relationship between RxMapper and Plaintiff by directing RxMapper to breach its contractual obligations to Plaintiff by (i) falsely representing that Plaintiff committed a material breach of the Operating Agreement, and (ii) secretly amending the Operating Agreement twice. D.I. 2 ¶ 135. I agree with the Individual Defendants that they cannot be liable for tortious interference with contract in their capacity as owners of RxMapper. *See Kuroda v.*

13

*SPJS Holdings, L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009) ("[A] party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract."). The Individual Defendants, however, are also a party to the contract as officers of RxMapper. And employees and directors of a contracting organization can tortiously interfere with the contract if they act beyond the scope of their roles. *See Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994); *Kuroda*, 971 A.2d at 885. In the section on tortious interference, the complaint states that "[t]he individual Defendants[] . . . were motivated by a desire to harm Plaintiff and to force Plaintiff to sell his Founding Member Units." D.I. 2 ¶ 136. The rest of the Complaint details factual allegations to support this conclusion, including facts related to the multi-phase scheme that support Individual Defendants acting for personal reasons and thus exceeding the scope of their authority as managers of RxMapper. *See, e.g., Nye v. Univ. of Delaware*, 2003 WL 22176412, at *2, 7 (Del. Super. Ct. Sept. 17, 2003) (declining to dismiss intentional interference with contract count because plaintiff alleged facts to support defendants acting outside the scope of their authority). Whether the Individual Defendants acted within "their scope of authority or not is a question of fact," so I will decline to determine whether they acted within the scope of their role as managers at the motion to dismiss stage. *See West v. Access Control Related Enterprises, LLC*, 2019 WL 2385863, at *5 (Del. Super. Ct. June 5, 2019).

14

### D.   Count VI

Finally, I will dismiss Count VI. The Complaint's sixth cause of action pleads that "Defendants [] converted property belonging to Plaintiff when they forced Plaintiff to sell his Founding Member Units" at an "artificially deflated price." D.I. 2 ¶¶ 142, 144. As explained above, plaintiffs cannot assert tort claims along with a contract claim unless the tort claim involves "violation of a duty which arises by operation of law and not by the mere agreement of the parties." *Cornell Glasgow*, 2012 WL 2106945, at *8 (internal quotation marks omitted). To establish a conversion claim separate from the breach of contract claim, Plaintiff "would have to show that he had a right to the money—other than a right pursuant to the contract—that was violated by the defendants' exercise of dominion over the money." *Kuroda*, 971 A.2d at 890. The only right articulated in the complaint is Plaintiff's right to his Founding Member Units pursuant to the Operating Agreement, so I must dismiss the conversion claim for failing to identify an "interference with a right to the money independent of rights granted under the contract." *Id.*; *see* D.I. 2 ¶¶ 29, 140–144, 155.

Plaintiff does not dispute that conversion claims cannot be brought along with breach of contract claims. *See* D.I. 23 at 21. Plaintiff's only response is that "Defendants do not commit that the Operating Agreement is a valid and enforceable contract, a necessary predicate for arguing that Plaintiff's interest in

15

RxMapper stems solely from the Operating Agreement," so I should not dismiss the conversion claim until "Defendants[] answer the breach of contract claim and admit that the Operating Agreement . . . is valid and enforceable." D.I. 23 at 21. I disagree. Plaintiff brought a breach of contract claim in Count VII, alleging that the "Operating Agreement is a valid and enforceable contract." D.I. 2 ¶ 148. Defendants moved to dismiss every count except Count VII and attached the Operating Agreements as exhibits to their motion. *See* D.I. 18 at 1–3; D.I. 18-1. Accordingly, Defendants do not dispute that the Operating Agreement is valid and enforceable, and I can dismiss the conversion claim at this stage.

## IV. CONCLUSION

For the foregoing reasons, I will grant in part and deny in part Defendants' motion to dismiss. I will allow Counts I, II, and V to proceed. I will dismiss Counts III, IV, and VI.

The Court will enter an Order consistent with this Memorandum Opinion.